USAO#2013R00731/DAW

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : HON. |
| | : Criminal No. 15- *593 (WHW)* |
| v. | : |
| | : 18 U.S.C. § 1347 |
| KIRTISH N. PATEL | : 18 U.S.C. § 2 |

INFORMATION

The defendant having waived in open court prosecution by

indictment, the United States Attorney for the District of New Jersey charges:

BACKGROUND

1.      At all times relevant to this Information, unless otherwise

indicated:

a. The defendant, KIRTISH N. PATEL, resided in Rockaway, New
   Jersey, with his wife, Nita K. Patel.

b. KIRTISH N. PATEL was the owner of Biosound Medical Services,
   Inc.  Nita K. Patel was the owner of Heart Solution, PC.

c. Biosound Medical Services, Inc. and Heart Solution, PC were
   companies offering mobile diagnostic test services such as
   echocardiograms, ultrasounds, and nerve conduction studies
   that were conducted on-site at a physician's office.

d. KIRTISH N. PATEL and Nita K. Patel both operated Biosound
   Medical Services, Inc. and Heart Solution, PC (collectively,
   "Biosound").

e. KIRTISH N. PATEL and Nita K. Patel were not physicians and
   never had been physicians.

f. The Medicare Program ("Medicare") was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f). Biosound Medical Services, Inc. was a Medicare-approved provider since approximately 1999. Heart Solution, PC was a Medicare-approved provider since approximately 2011.

g. Private insurance companies and Medicare regularly reimbursed Biosound for the performance and interpretation of diagnostic tests that had been ordered by a patient's primary care physician (the "Referring Doctor"). Such tests were ordered by the Referring Doctor as necessary for the diagnosis and/or treatment of serious health conditions and included, among other tests, 1) echocardiograms to diagnose heart conditions, 2) chest, abdominal, and lower leg ultrasounds to detect blood clots and abdominal aortic aneurysms, and 3) carotid ultrasounds to detect the risk of stroke.

h. In order to receive reimbursement for its services, Medicare required that independent diagnostic companies like Biosound have a licensed subspecialist physician on staff to supervise and interpret any tests performed in a particular subspecialty. For

2

example, in order to be a Medicare-approved provider of neurological diagnostic testing, Biosound was required by Medicare to have a licensed neurologist on staff to supervise and interpret any neurological testing performed. Similarly, in order to be a Medicare-approved provider of cardiac diagnostic testing, Biosound was required by Medicare to have a licensed cardiologist on staff to supervise and interpret any cardiac testing performed.

## THE SCHEME

2.     Biosound purported to offer diagnostic testing administration and interpretation services in the convenience of a primary care physician's own office. In response to a Referring Doctor's request for a diagnostic test for a patient, an employee of Biosound, often defendant KIRTISH N. PATEL, travelled to the office of the Referring Doctor to administer the diagnostic test. Biosound then purported to send the test results to an appropriate specialist physician (e.g., cardiologist) (the "Reading Doctor"), who was paid by Biosound to interpret the results. Biosound then transmitted back to the Referring Doctor a diagnostic report that had been purportedly authored and signed by the Reading Doctor who interpreted the diagnostic results. The Referring Doctor would then rely upon the findings in the diagnostic report to make treatment decisions for the patient.

3.     Beginning at least as early as in or about October 2008, defendant KIRTISH N. PATEL and Nita K. Patel stopped transmitting all of the

3

Biosound diagnostic test results to a Reading Doctor to interpret the values and write a diagnostic report. Instead, defendant KIRTISH N. PATEL, who had no medical license, wrote the diagnostic reports. Knowing KIRTISH N. PATEL had authored the report, Nita K. Patel would then affix a doctor's signature to the report that was sent back to the Referring Doctor.

4.      Believing the diagnostic report to have been interpreted and authored by a licensed specialist physician, the Referring Doctor then relied upon the diagnostic findings to make treatment decisions for the patient. The treatment decisions at issue were for serious and life-threatening health conditions including heart defects, blood clots, abdominal aortic aneurysms, and risk factors for stroke.

5.      Defendant KIRTISH N. PATEL and Nita K. Patel maintained a container of cut up pieces of paper bearing physician signatures at the Biosound office. Nita K. Patel first used an office photocopier, and, later, electronic methods, to affix doctor signatures onto Biosound diagnostic reports that were never interpreted or authored by any licensed physician.

6.      Defendant KIRTISH N. PATEL and Nita K. Patel forged doctor signatures on more than half of the thousands of diagnostic reports that were produced by Biosound. The doctors whose names were forged on Biosound diagnostic reports were unaware that their signatures were being misappropriated and, indeed, had never reviewed or interpreted the reports to which their signatures were affixed.

4

7. Because no Reading Doctor ever reviewed or interpreted the diagnostic test results, the reports forged by defendant KIRTISH N. PATEL and Nita K. Patel were worthless and contained no reliable information upon which a patient treatment decision could have been based. Defendant KIRTISH N. PATEL and Nita K. Patel thus failed to provide the diagnostic information that the Referring Doctors had deemed necessary for the diagnosis and/or treatment of the serious health conditions of their patients.

8. As an example, in at least one instance, defendant KIRTISH N. PATEL and Nita K. Patel were out of the office on a vacation when a Referring Doctor inquired as to the status of a pending diagnostic report that had not yet been sent to or reviewed by any Reading Doctor. A Biosound employee telephoned defendant KIRTISH N. PATEL on vacation and was instructed by defendant KIRTISH N. PATEL, without referencing any patient file or diagnostic values, how to draft the requested diagnostic report – including what diagnostic values to reflect—and to send it to the Referring Doctor.

9. When confronted by Biosound employees who were concerned as to whether an actual licensed physician was interpreting the diagnostic tests and writing the reports, defendant KIRTISH N. PATEL replied, in sum and substance, "Why should I pay these doctors when I can read them?"

10. In addition, beginning in or around September 2006, defendant KIRTISH N. PATEL indicated to Medicare that Biosound would begin performing neurological diagnostic testing. In his application to Medicare, defendant KIRTISH N. PATEL falsely indicated that Biosound's neurological

5

diagnostic testing would be supervised by a physician who was, in fact, never associated with Biosound and who had never agreed to supervise Biosound's neurological testing. Based on that false representation, Biosound became a Medicare-approved provider of neurological diagnostic testing. From in or around September 2006 through June 2014, none of the neurological testing performed by Biosound was supervised by the neurologist that KIRTISH N. PATEL indicated to Medicare was supervising Biosound's neurological testing.

11.    Without defendant KIRTISH N. PATEL's false representation that Biosound's neurological testing was, in fact, being supervised by a licensed neurologist, Medicare never would have approved or paid Biosound for the neurological diagnostic testing of Medicare beneficiaries.

12.    In this fashion, defendant KIRTISH N. PATEL and Nita K. Patel were paid more than $4,386,133.75 by Medicare and private insurance companies for diagnostic testing and reports that were never interpreted by a licensed physician and neurological diagnostic testing that was never supervised by a licensed neurologist.

13.    Defendant KIRTISH N. PATEL and Nita K. Patel used their ill-gotten gains to finance a lifestyle in which they amassed millions of dollars, purchased multiple residences, and drove multiple luxury vehicles, some of which were purchased entirely in cash.

6

14.     From in or about September 2006 through in or about June 2014, in Morris County, in the District of New Jersey, and elsewhere, the defendant,

KIRTISH N. PATEL,

did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, as defined under Title 18, United States Code, Section 24(b), namely, the Medicare program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, a health care benefit program, namely, the Medicare Part B program, in connection with the delivery of or payment for health care benefits, items, and services.

All in violation of Title 18, United States Code, Sections 1347 and 2.

7

## FORFEITURE

1.      As a result of committing the Federal health care fraud offense (as defined in 18 U.S.C. § 24) in violation of 18 U.S.C. § 1347, as alleged in this Information, defendant KIRTISH N. PATEL shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense, including but not limited to the following:

> a. A sum of money equal to the amount of gross proceeds traceable to the commission of the Federal health care fraud offense charged in this Information, for which the defendant and Nita K. Patel are jointly and severally liable.

> b. All right, title and interest of the defendant KIRTISH N. PATEL in all securities, funds and other property on deposit in Account Nos. ▮▮▮9062 and ▮▮▮4968 in the name of Bhaviravi LLC at Wells Fargo Advisors, up to the amount of the gross proceeds traceable to the commission of the Federal health care fraud offense charged in this Information.

### Substitute Assets Provision

2.      If any of the property described above, as a result of any act or omission of the defendant or Nita K. Patel:

> a. cannot be located upon the exercise of due diligence;

> b. has been transferred or sold to, or deposited with, a third party;

> c. has been placed beyond the jurisdiction of the court;

8

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), to forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

*Paul J. Fishman / emc*

PAUL J. FISHMAN
United States Attorney

9

CASE NUMBER:

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

v.

## KIRTISH N. PATEL

# INFORMATION FOR

18 U.S.C. §§ 1347, 2

## PAUL J. FISHMAN
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

DANIELLE ALFONZO WALSMAN
*ASSISTANT U.S. ATTORNEY*
*(973)645-2724*

USA-48AD 8
(Ed. 1/97)